[Cite as *In re T.N.*, 2016-Ohio-5774.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

IN RE:

      T.N.,

CASE NO.  9-15-36

ALLEGED UNRULY/
DELINQUENT CHILD

O P I N I O N

Appeal from Marion County Common Pleas Court
Juvenile Division
Trial Court No. 2015 DL00109

Judgment Affirmed

Date of Decision:   September 12, 2016

APPEARANCES:

    *Todd A. Workman* for Appellant

    *Jason M. Miller* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, T.N., appeals the judgment of disposition entered by the Court of Common Pleas of Marion County, Family Division, adjudicating him a delinquent/unruly child for one count of rape, committing him to the Ohio Department of Youth Services ("the Department") for a minimum of one year up to a maximum term up to his 21st birthday, and sentencing him to a period of four years in prison. On appeal, T.N. argues that the trial court erred by entering a verdict that was not supported by sufficient evidence; entering a verdict that was against the manifest weight of the evidence; and admitting other acts evidence at trial. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On May 27, 2014, a complaint was filed in the Court of Common Pleas of Hardin County, Juvenile Division, alleging that T.N. was delinquent of one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree if committed by an adult; and one count of rape in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree if committed by an adult.

{¶3} On May 27, 2014, the State filed a motion to transfer the case over to the Court of Common Pleas of Hardin County, General Division, so that T.N. could be prosecuted as an adult.

{¶4} On July 1, 2014, the State responded to T.N's demand for discovery, which had been filed previously. The State's response included, among other documents, several witness statements.

{¶5} A hearing was held on the State's motion on October 10, 2014. Ultimately, the trial court denied the State's motion.

{¶6} On October 24, 2014, the Hardin County Grand Jury returned a two-count indictment against T.N. alleging that he was delinquent of one count of rape with a specification in violation of R.C. 2907.02(A)(2), 2152.02(F), 2152.11(D)(2)(b), and 2152.13, a felony of the first degree if committed by an adult; and one count of rape with a specification in violation of R.C. 2907.02(A)(1)(c), 2152.02(F), 2152.11(D)(2)(b), and 2152.13, a felony of the first degree if committed by an adult. T.N. entered denials and pleas of not guilty to both charges.

{¶7} The matter proceeded to a two-day jury trial on January 8 and January 9, 2015. T.L. was the first witness to testify on behalf of the State. She testified that she and her friend, A.M., attended a party on March 8, 2014 and were accompanied by two other friends, D.R. and C.H. T.L. stated that the party was hosted by Cane Haney, a recent graduate of their high school. She explained that she knew the others through school. She testified that she and A.M. brought a 12-pack of Strawberitas and a bottle of vodka to share, both of which were alcoholic beverages.

{¶8} T.L. stated that they arrived at Haney's house sometime that evening. She added that several other people were there, including T.H., Z.R., C.W., Haney, and the defendant, T.N. She explained that she did not know T.N. personally, but knew of him prior to the party. She added that she had never spoken to him, never was romantically linked to him, nor married to him. She testified that she never talked with T.N. during the party.

{¶9} T.L. stated that once they arrived at the party, they all began to drink the alcoholic beverages they brought. T.L. explained that she could not remember how much she had to drink because she was too intoxicated. As a result of her condition that night, T.L. testified that she vomited over herself and a bed that she was sleeping in at the time.

{¶10} T.L. explained that the house was a two-story home and that the party was being held in the kitchen and living room on the first floor. She added that she went to sleep in one of the bedrooms upstairs. She stated that she was wearing a shirt and a pair of leggings when she went to sleep.

{¶11} T.L. testified that she remained asleep until she was awoken by T.N., who was attempting to take off her pants. She claimed that she was able to recognize T.N. even though she was still heavily intoxicated. T.L. stated that T.N. was able to take off her pants, although T.L. was yelling and telling T.N. to stop. She explained that she was yelling because she did not want T.N. to do anything to her.

She testified that T.N. was holding her arms down while she was on her side and telling her to be quiet. She added that she consistently told T.N. to stop, but T.N. removed her underwear and penetrated her vagina with his penis. This continued for approximately ten minutes, and T.L. explained that she continuously told T.N. to stop and that T.N. would tell her to be quiet.

{¶12} When it was over, T.L. testified that T.N. got up and walked away without saying anything. T.L. stated that she then ran out of the room and continued to cry hysterically until A.M. and Haney came upstairs. She told them that somebody just had sex with her, and Haney ran downstairs in an attempt to figure out what happened to T.L. She explained that she was holding the area near her vagina because she was hurting. T.L. could not remember if she told anyone that night that it was T.N. that had sex with her.

{¶13} She testified that Haney gave her some of his clothes to wear home and that she, A.M., and T.H. went back to A.M.'s house. She added that she spent the night there with A.M. Either that night or the next morning, T.L. stated that she told A.M.'s mother what happened at the party. On the morning after the party, T.L. testified that she wore some of A.M.'s clothes, returned to Haney's house to give him back his clothes, went to Lima, and then went home. She explained that she did not tell her parents what happened because she was afraid that they would be upset with her for attending a party and drinking alcoholic beverages. T.L. testified

that A.M.'s mother drove her to a hospital in Lima to get checked out by medical personnel. She added that they performed a rape kit on her at the hospital.

{¶14} T.L. explained that when she originally spoke to law enforcement she lied about there being no alcoholic beverages at the party because she did not want anyone to get into trouble since everyone was under the age of 21. She confirmed that the next day she told the officers the truth. She added that she was too intoxicated to know what was going on at the party.

{¶15} On cross-examination, T.L. admitted that she lied to A.M.'s mother about what she and A.M. were going to do the night of the party. She affirmed that she did not consume any alcoholic beverages before arriving at the party. T.L. could not remember how much she drank but could recall that she drank very fast. She added that she did not know how long she was upstairs asleep before the alleged rape occurred.

{¶16} On re-direct-examination, T.L. testified that there was no doubt in her mind that it was T.N. that had raped her.

{¶17} Haney was the next witness to testify on behalf of the State. Haney stated that he was hanging out with two friends, K.H. and D.F. during the day on March 8, 2014. He testified that C.H. called him up and Haney said that C.H. and some other people could come over to hang out and drink some beers. He added

that when C.H. arrived, C.H. was accompanied by D.R., A.M., and T.L. The others, including T.N., did not arrive until later.

{¶18} Haney testified that he observed T.L. drinking vodka at the party. At one point during the party, Haney stated that he left to go to Alger and returned approximately 20 to 25 minutes later. He explained that he stayed for another two hours before leaving to go get food from McDonald's. During this time, Haney described T.L. as being "pretty well gone." Trial Tr. Vol. I., p. 184. He elaborated that he came home to find that she had vomited all over herself and on his bed. He stated that he gave her some clothing to put on and stayed with her for about an hour to make sure she was ok. During this time, he explained that T.L. was dry heaving. She was also wearing only her bra and underwear on the bed. Haney added that he wrapped T.L. in a blanket because she was cold.

{¶19} Haney testified that he, G.C., T.H., C.H., and A.B. all went to McDonald's together and were gone for about 30 minutes. He explained that D.R., A.M., T.L, and T.N. remained at the house while he and the rest went out for food. Specifically, D.R. was sitting on one couch while T.N. and A.M. were on the other couch, and T.L. was asleep upstairs in Haney's bedroom.

{¶20} Once he returned from McDonald's, Haney was alerted by D.R. that something might be wrong with T.L. Haney testified that he went upstairs and found T.L. crying on the mattress where he had left her. He stated that he asked T.L. what

was wrong and after learning what happened, went downstairs to figure out what went on while he was gone. Haney explained that he asked T.N. if he had raped T.L. and T.N. denied it. He added that T.N. repeatedly denied the allegations and swore on Haney's dead brother's grave. After everyone else had left, Haney testified that T.N. stayed at the house.

{¶21} On cross-examination, Haney testified that D.R. had gone upstairs first and found T.L. crying. D.R. also told Haney that T.N. had told D.R. that T.N. was going upstairs to check on T.L. He added that when he left for McDonald's the only people awake were D.R. and T.N. A.M. was asleep on the same couch as T.N. and T.L. was upstairs asleep, however, A.M. awoke by the time he returned.

{¶22} Haney testified that it was pretty easy to hear things from his bedroom to the living room. He admitted that T.L. never said she was raped. He added that given the difference between when each person arrived that T.N. would only have been present for about 15 to 20 minutes before T.L. went to bed. Haney stated that T.N. was drinking Busch Lite and seemed like he "had a good buzz." *Id.* at 212.

{¶23} On re-direct-examination, Haney clarified that T.N. was actually pretty drunk that night. He testified that T.N. had consumed approximately 24 beers that day.

{¶24} Kristy Jakeway was the next witness to testify on behalf of the State. Jakeway testified that she was a registered nurse in the emergency room at Lima

Memorial Hospital. Although she stated that she was not certified as a Sexual Assault Nurse Examiner, she explained that she had performed several rape kits in the past.

{¶25} Jakeway testified that she was working on March 9, 2014. She stated that she was in the room with T.L. and the doctor while the rape kit was being performed. She explained that T.L. appeared agitated and was crying throughout the exam.

{¶26} D.R. was the next witness to testify on behalf of the State. D.R. testified that he drove C.H., A.M., and T.L. to Haney's party on March 8, 2014. He stated that T.L. became drunk after drinking at the party. He added that he did not talk with T.L. much during the party.

{¶27} After nearly everyone had left to go get food, D.R. stated that he, A.M., T.L., and T.N. were the only people at the house. D.R. testified that he, along with A.M. and T.N., checked on T.L. after people left and she was asleep. After they checked on T.L., D.R. explained that he and A.M. returned downstairs while T.N. stayed with T.L.

{¶28} D.R. testified that T.N. came downstairs approximately five to ten minutes later and appeared to be smiling and laughing. Soon after T.N. returned, D.R. stated that he thought he heard someone call his name, but thought nothing of it until he heard it again. D.R. explained that he could hear T.L. crying out for him

and when he went upstairs he saw her crying and she told him what happened. He continued and said that when Haney came home he told Haney that Haney needed to go talk to T.L.

{¶29} On cross-examination, D.R. testified that T.L. was wearing a bra and underwear when he checked on her condition while the others were getting food. He admitted that he never heard any screaming while T.N. was upstairs with T.L.

{¶30} Z.R. was the next witness to testify on behalf of the State. Z.R. testified that he attended Haney's party on March 8, 2014. He stated that he arrived at the party with T.H, C.H., and T.S. He said that T.L. appeared to be drunk because she could not stand very well or talk very well. He added that he and T.H. helped T.L. upstairs so that no one would mess with her because she was drunk.

{¶31} Z.R. testified that when they took T.L. upstairs she was wearing a shirt and shorts. He stated that he witnessed T.L. vomit on herself and the bed where she was lying. He explained that after he helped T.L. he went home. Z.R. added that it was hard to determine if T.L. was comprehending his questions because her speech was slurred.

{¶32} After Z.R.'s testimony, the trial was concluded for the day and the jury was excused. After the jury left, a discussion was held on the record regarding the State's intention to use prior acts evidence to establish T.N.'s motive for committing

the alleged crimes. Both parties were ordered to prepare arguments for the following morning.

**{¶33}** On January 9, 2015, before the trial resumed, T.N. filed a motion in limine. In his motion, T.N. argued that the court should exclude all "other acts" evidence as it pertains to plan or scheme. T.N. argued that the general rule was that "other acts" evidence should be excluded and none of the exceptions to that rule applied in this case. He also argued that the State failed to provide the requisite notice under Evid.R. 404(B). The State opposed the motion. The court did not rule on the motion at that time.

**{¶34}** Detective Matt Douglas of the Hardin County Sheriff's Office was the next witness to testify on behalf of the State. Detective Douglas testified that he was working on March 9, 2014 when he received a call to locate T.N. as T.N. was a suspect in the alleged rape of T.L. Detective Douglas then identified a flash drive containing recorded interviews with T.N. that were conducted on March 10, 2014. The interview was then played for the jury. Detective Douglas testified that T.N. swore to the truth of his statements that he had given Detective Douglas under the pains and penalties of perjury.

**{¶35}** Detective Douglas testified that T.N. was not truthful during the interview. He stated that T.N. denied having sex with T.L. approximately ten times during the interview. Detective Douglas explained that T.N. initially claimed that

he did not know T.L.'s name and referred to her as "that girl." He continued that T.N. spontaneously then named T.L. and tried to hide the fact that he knew her name. He testified that T.N. denied ever being alone with T.L. He added that T.N. submitted a DNA sample.

{¶36} Detective Douglas testified that there were several discrepancies with T.N.'s account of the events. He stated that T.N. kept changing his story about what T.L. was wearing when T.N. and the others checked on T.L.

{¶37} On cross-examination, Detective Douglas admitted that he did not find T.L. to be completely honest with him about the events. However, he clarified that the only parts she was not honest about were the parts involving alcoholic beverages at the party and the people consuming the alcoholic beverages. He added that he also spoke with several of the other people who attended the party.

{¶38} A.M. was the next witness to testify on behalf of the State. A.M. testified that she attended Haney's party on March 8, 2014 with T.L. and the others. She stated that she and T.L. consumed at least four or five Strawberitas each as well as some vodka that they had brought. She added that she, D.R., and T.N. checked on T.L. after T.L. had been taken upstairs. A.M. explained that T.L. was wrapped in a blanket on a mattress and was only wearing a bra and underwear. She stated that she and D.R. went back downstairs, but T.N. stayed with T.L. on a couch next to T.L.

**{¶39}** A.M. stated that prior to checking on T.L. she and T.N. were sitting on a couch together downstairs. Counsel for T.N. objected to this testimony and line of questioning, and a sidebar was held outside the hearing of the jury. At this time, the court denied T.N.'s motion in limine and overruled the objection. Questioning of A.M. resumed and she testified that T.N. tried to get into her pants while the two were on the couch. Specifically, A.M. explained that T.N. tried to unbutton her pants using his hands but stopped once A.M. told him to stop. She added that this occurred approximately five minutes before she, D.R., and T.N. went upstairs to check on T.L.

**{¶40}** On cross-examination, A.M. stated that she did not see much of T.L. at the party and did not know exactly how much T.L. had to drink that night.

**{¶41}** Sergeant Melissa Davis of the Logan County Sheriff's Office was the final witness to testify on behalf of the State. Sergeant Davis testified that she worked in the Juvenile Detention Center ("JDC") in Logan County as a corrections officer. She described an event that occurred involving T.N. on October 10, 2014, while he was at the JDC. According to Sergeant Davis, T.N. told her that he had a scheduled court hearing that day, but he was not taken to it. T.N. asked her if he could call the judge to find out what went wrong, but the policy of the JDC is that juveniles may only use written communication with the judge.

{¶42} Sergeant Davis then identified a letter written by T.N. and addressed to the judge. In the letter, which was later admitted into evidence, T.N. admitted to having sex with T.L., but claimed that it was consensual.

{¶43} At the conclusion of Sergeant Davis's testimony, the State rested. In addition to the recorded interview and the admission letter, the results of a DNA test were admitted. The DNA, which was collected from T.L.'s vaginal swabs and T.N.'s voluntary submission, supported the State's theory that T.N. and T.L. engaged in intercourse. Specifically, two DNA profiles were identified from T.L.'s vaginal swab; semen was identified in T.L.'s vaginal swabs; and the other DNA profile matched that of T.N. The defense stipulated to the results of the DNA test.

{¶44} The defense rested without presenting any witnesses. Then, after a brief recess, the defense moved for an acquittal pursuant to Crim.R. 29, which was denied.

{¶45} During closing arguments, the prosecutor stated the following:

Something's going on on the couch between [T.N.] and [A.M.] She testified about that today. Didn't get as far maybe as they could of and she tells him, 'no, I don't want you to put your hands there.' So what does he do? He finds someone else who cannot say no. Who is not in a position to say no. Or straight up, can't resist. And performs the task that he has in mind. Unfortunately, that happens upstairs and [T.L.] is on the receiving end of that.

Trial Tr. Vol. II, p. 108.

{¶46} After closing arguments, the jury was given instructions by the trial court, including the following:

Evidence was received about the commission of acts other than the offenses with which the Defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of [T.N.] in order to show that he acted in conformity or accordance with that character. If you find that - - that evidence of other acts is true and that [T.N.] committed it, you may consider that evidence only for the purpose of deciding whether it proves his scheme, plan, or system in doing an act to commit the offense charged in this trial. That evidence cannot be considered for any other purpose.

*Id.* at 126.

{¶47} Before the jury was given the case, counsel for T.N. moved for a mistrial based primarily on the "other acts" evidence. The trial court denied the motion.

{¶48} After deliberating, the jury found T.N. not guilty as to count one (Rape in violation of R.C. 2907.02(A)(2)) and guilty as to count two (Rape in violation of R.C. 2907.02(A)(1)(a)). T.N.'s placement on house arrest pending disposition was continued. The matter was set for a serious youthful offender ("SYO") hearing at a later date.

{¶49} On February 19, 2015, the State filed a motion to revoke the interim release order because T.N. allegedly broke the terms of his house arrest. A hearing was held on the State's motion, and the trial court granted the motion on March 3, 2015. T.N. was ordered to be placed in the JDC until further notice from the court.

{¶50} On March 3, 2015, after the SYO hearing, the trial court designated T.N. as a SYO. Further, the court ordered the matter be transferred to Marion County for disposition, as Marion was the county of T.N.'s residence. The case was transferred to the Court of Common Pleas of Marion County, Family Division, on March 30, 2015.

{¶51} A dispositional hearing was held on September 3, 2015. At the conclusion of the hearing, the court sentenced T.N. to a minimum commitment of one year to the Department and a maximum term up to T.N.'s 21st birthday. T.N. was also ordered to complete the Department's sex offender treatment program. This was memorialized by the court in an entry filed on September 17, 2015. Additionally, T.N. was sentenced to a prison term of four years given his SYO designation, which was stayed and would not be imposed so long as he met certain requirements. The court also informed T.N. that he would be subject to a mandatory period of five years of postrelease control if he ever serves any part of his prison sentence.

{¶52} T.N. filed this timely appeal, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT/JURY ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT IN ENTERING A GUILTY VERDICT TO THE OFFENSE OF RAPE AS THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS.**

*Assignment of Error No. II*

**THE TRIAL COURT/JURY ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT IN ENTERING A GUILTY VERDICT TO THE OFFENSE OF RAPE AS THE VERDICTS ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT/APPELLANT WHEN IT ADMITTED, OVER APPELLANT'S OBJECTION, OTHER BAD ACTS EVIDENCE TO THE JURY.**

*Assignment of Error No. I*

{¶53} In his first assignment of error, T.N. argues that the trial court erred by entering a guilty verdict that was not supported by sufficient evidence. We disagree.

{¶54} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a

verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

**{¶55}** T.N. was convicted of one count of rape in violation of R.C. 2907.02(A)(1)(c). Under this provision, a person is guilty of rape if he engages in sexual conduct with another who is not his spouse when the other person's ability to either consent or resist is substantially impaired because of a physical condition, and the offender either knows or has reasonable cause to believe that the other person's ability to consent or resist is substantially impaired due to that condition. R.C. 2907.02(A)(1)(c). Sexual conduct is defined as "vaginal intercourse between a male and female * * *. Penetration, however slight, is sufficient to complete vaginal * * * intercourse." R.C. 2907.01(A).

**{¶56}** Because "substantial impairment" is not defined in the Ohio Criminal Code, the Supreme Court of Ohio has found that "substantial impairment" can be established "by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987); *State v. Brown*, 3d Dist. Marion No. 9-09-15, 2009-Ohio-5428, ¶ 21. Further, substantial impairment "does not have to be proven by expert medical testimony; rather, it can be shown to exist by the testimony of people who have interacted with the victim, and by allowing the trier of fact to do its own assessment of the person's ability to appraise or control

his or her conduct." *State v. Brady*, 8th Dist. Cuyahoga No. 87854, 2007-Ohio-1453, ¶ 78; *Brown* at ¶ 21. Finally, a determination of substantial impairment is made "on a case-by-case basis, providing great deference to the fact-finder." *Brown* at ¶ 22.

**{¶57}** "Voluntary intoxication constitutes a 'mental or physical condition' that can cause substantial impartment under R.C. 2907.02(A)(1)(c)." *State v. Lasenby*, 3d Dist. Allen No. 1-13-36, 2014-Ohio-1878, ¶ 28, citing *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, ¶ 14. "The consumption of large amounts of alcohol in a short period of time is evidence that voluntary intoxication caused substantial impairment." *Id.*, citing *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, ¶ 22 (2d Dist.). It is also sufficient if the victim testifies that she is unable to remember the events of the incident to establish substantial impairment. *Id.*, citing *Harmath* at ¶ 19. "[S]tumbling, falling, slurred speech, passing out, [and] vomiting," are evidence that an intoxicated person is substantially impaired. *Hatten* at ¶ 24. However, "there can be a fine, fuzzy, and subjective line between intoxication and impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when reviewing whether the defendant knew, or should have known, that someone was impaired rather than merely intoxicated." *State v. Doss*, 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449, ¶ 18.

{¶58} T.N. does not dispute that he and T.L. engaged in sexual conduct. Rather, he argues that the State failed to present any evidence that he knew or had reasonable cause to believe that T.L. was substantially impaired and that T.L. was substantially impaired at the time of the sexual conduct. We are not convinced.

{¶59} First, there was sufficient evidence to establish that T.L. was substantially impaired as a result of voluntary intoxication. At trial, everyone at the party who testified stated that T.L. was severely intoxicated that night. First and foremost, T.L. testified that she barely remembered the party. She, along with nearly everyone else, stated that she vomited over herself as a result of her drinking too much alcohol in a short period of time. She also explained that she did not consume any alcohol until she arrived at the party and that she did so very fast. Specifically, evidence was presented to show that she consumed at least five Strawberitas and drank some of the vodka that she and A.M. brought to the party. Haney testified that T.L. was "pretty much gone" and stated that she was still dry heaving when he was watching her to make sure she would be ok. Z.R. witnessed T.L. vomit and helped her upstairs. He also testified that T.L.'s speech was slurred. Finally, it appears that all of the events took part over only a few hours.

{¶60} Second, there was sufficient evidence to establish that T.N. knew or had reasonable cause to believe that T.L. was substantially impaired. By his own admission in the letter to the judge, he knew that T.L. was at a minimum intoxicated.

-20-

Although this alone may not meet the evidentiary requirement, other evidence offered by the State was sufficient to support this element. No one testified that they saw T.N. and T.L. talking with each other or hanging out, but everyone at the party was able to testify as to T.L.'s level of intoxication. Everyone testified that they knew that T.L. had vomited on herself. Several people testified that T.N. was at the party while T.L. was there drinking. Further, A.M. and D.R. both testified that T.N. accompanied them to check on T.L. In his interview, T.N. admitted that he went with the others to check on T.L. who was passed out in Haney's room.

{¶61} Therefore, upon review of the record, we find that any rational trier of fact could have found that T.N. committed rape beyond a reasonable doubt. The circumstances of the events described by all the witnesses support the conclusion that T.N. knew or had reasonable cause to believe that T.L. was substantially impaired due to a physical condition (voluntary intoxication). Moreover, testimony was presented that T.N. and T.L. engaged in sexual conduct and that T.L. was not T.N.'s spouse. Thus, after viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of rape beyond a reasonable doubt.

{¶62} Accordingly, we overrule T.N.'s first assignment of error.

*Assignment of Error No. II*

**{¶63}** In his second assignment of error, T.N. argues that the trial court erred by entering a verdict that was against the manifest weight of the evidence. We disagree.

**{¶64}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387. Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

**{¶65}** Having disposed of T.N.'s sufficiency argument, we similarly reject T.N.'s argument that the verdict is against the manifest weight of the evidence. T.N. makes the same arguments here as he did above, but adds that the State's only material witness, T.L., was not credible. In support of his argument, T.N. argues that there were several instances of T.L.'s testimony that were contradicted by others. For instance, she claimed that T.N. removed her pants, but other witnesses

testified that she was wearing only a bra and underwear once she went to sleep. Further, no one corroborated her testimony that she was screaming while T.N. was raping her. T.N. also argues that T.L. should not have been seen as credible because she admitted that she lied several times the day of the party and the day after. Specifically, she lied to her parents and A.M.'s mother about the party and to police about alcohol at the party. Therefore, T.N. argues that this lack of credibility renders the verdict against the manifest weight of the evidence.

{¶66} "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, a jury is free to find the State's witnesses were credible. *See State v. Brown*, 3d Dist. Hardin No. 6-12-01, 2012-Ohio-3904, ¶ 15 ("To begin with, a reviewing court must allow the trier of fact appropriate discretion on the credibility of witnesses"); *State v. Hoseclaw*, 3d Dist. Allen No. 1-12-31, 2013-Ohio-3486, ¶ 24 (jury was free to believe the victim's testimony regarding why she did not report the rape until nine months after it happened).

{¶67} Although there were certainly some discrepancies between T.L.'s testimony and that of the other partygoers, we cannot say that the jury clearly lost its way by convicting T.N. There was no dispute that T.N. and T.L. engaged in sexual conduct. Therefore, the only remaining issues were: was T.L. substantially

-23-

impaired; and did T.N. know or have reasonable cause to believe that T.L. was substantially impaired. As we explained in more detail supra, there was a plethora of testimony presented to establish T.L.'s state of substantial impairment. Although T.N. did not interact with T.L. prior to the sexual conduct, the jury was free to believe the testimony of the other witnesses to conclude that T.N. knew or had reasonable cause to believe T.L. was substantially impaired.

{¶68} Accordingly, we overrule T.N.'s second assignment of error.

*Assignment of Error No. III*

{¶69} In his third assignment of error, T.N. argues that the trial court erred by admitting "other acts" evidence at trial. Specifically, T.N. argues that the State should not have been allowed to have A.M. testify as to T.N.'s sexual advances towards her at the party. We disagree.

{¶70} Generally, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Evid.R. 404(B). This rule derives from the long-standing principle that "proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime." *State v. Curry*, 43 Ohio St.2d 66, 68 (1975). Evidence of other crimes, wrongs, or acts is admissible, however, for other purposes, including proof of motive, opportunity, intent, preparation, plan, knowledge,

identity, or absence of mistake or accident. Evid.R. 404(B). "In criminal cases, the proponent of evidence to be offered under [404(B)] shall provide reasonable notice in advance of trial * * * of the general nature of any such evidence it intends to introduce at trial. *Id.* Additionally, R.C. 2945.59 states,

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

**{¶71}** "In determining whether evidence of other crimes, wrongs, or acts of the accused is admissible under Evid.R. 404(B), courts apply a three-step test." *State v. Machuca*, 3d Dist. Allen No. 1-15-01, 2016-Ohio-254, ¶ 40. "The first step is to consider whether the other acts evidence is relevant in making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20, *reconsideration of other issues granted*, 133 Ohio St.3d 1512, 2012-Ohio-6209. Second, a court must "consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Finally, the court

must "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403.

**{¶72}** As with other evidentiary issues, " 'The admission of such [other-acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice.' " *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 66. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 16-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Slappey*, 3d Dist. Marion No. 9-12-58, 2013-Ohio-1939, ¶ 12.

**{¶73}** T.N. first argues that the State failed to provide adequate notice of its intent to offer other acts evidence at trial. However, the State, in its response to T.N.'s discovery demand, provided the written statements of everyone at the party that would testify as to T.N.'s sexual advances on A.M. Further, the State listed these people as potential witnesses they intended to call at trial. Therefore, the State met its burden of providing reasonable notice to the defendant.

**{¶74}** T.N. next argues that the trial court abused its discretion by allowing the evidence in because there was no legitimate basis supporting it. As to the first step of the analysis, A.M.'s testimony was relevant because it tended to show T.N.'s scheme, plan, or system for engaging in sexual conduct. If this testimony was believed by the jury, then it could corroborate T.L.'s testimony that T.N. initiated the sexual conduct with her. This also rebutted T.N.'s statement in the interview that he preferred older girls. A.M. and T.L. were both the same age as T.N. at the time of the alleged rape.

**{¶75}** As to the second step, the State did not offer this testimony to prove that T.N. acted in accordance with his character. Per its instruction, the court let A.M.'s statements regarding the incident on the couch for "the purpose of deciding whether it proves [T.N.'s] scheme, plan, or system in doing an act to commit the offense charged in this trial." Trial Tr. Vol. II, p. 126. This court presumes that the jury followed that instruction. *See Williams*, 2012-Ohio-5695 at ¶ 23, citing *State v. Garner*, 74 Ohio St.3d 49, 59 (1995); *Pang v. Minch*, 53 Ohio St.3d 186, 195 (1990).

**{¶76}** Finally, A.M.'s testimony is not unduly prejudicial in this case because of the trial court's instruction that this evidence should not be considered to show that T.N. acted in conformity with a character trait. *See id.* at ¶ 24. Again, this

instruction lessened the prejudicial effect of A.M.'s testimony and corroborated T.L.'s testimony.

{¶77} Even if we were to assume, arguendo, that the trial court erred by admitting the other acts evidence, T.N. has failed to present an argument as to how he was prejudiced as a result. Therefore, any error would have been harmless.

{¶78} Thus, in this particular case, we cannot say that the trial court abused its discretion in allowing A.M. to testify as to other acts committed by T.N. prior to the alleged rape.

{¶79} Accordingly, we overrule T.N.'s third assignment of error.

{¶80} Having found no error prejudicial to the appellant, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and PRESTON, J., concur.**

**/jlr**